# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

VINCENT BARROW,

                                Plaintiff,

            v.                                                    No. 12-CV-1268
                                                                  (MAD/CFH)
DIANE VANBUREN, Deputy Commissioner;
BRIAN FISCHER, Commissioner; BRYAN HILTON,
Superintendent of Programs; CHARLES KELLY, JR.,
Superintendent; Marcy Correctional Facility;
DR. FARAGO, Psychiatrist; MICHAEL HOAGAN,
Deputy Commissioner, Office of Mental Health,
Department of Corrections; ANTHONY DEVITTO,
Executive Director of Special Programing; BOB LEWIS,
OMH Therapist; LISA KALIES, Unit Chief, OMH,
Residential Mental Health Unit; JOSEPH BELLNIER,
Deputy Commissioner of Program Service;
KENNETH S. PERLMAN, Deputy Commissioner of
Program Service; LUCIEN LECLAIRE, Assistant
Commissioner; MAUREEN E. BOLL, Deputy
Commissioner and Counsel; E. LINDQUIST, Assistant
Commissioner; KAREN BELLAMY, Director, Inmate
Grievance Program; JEFF McKOY, Deputy
Commissioner; MAUREEN BOSSCO, Executive
Director, Central New York Psychiatric Center,
Office of Mental Health; B. McARDLE, Deputy
Superintendent of Marcy Correctional Facility;
DONALD SELSKEY, Deputy Commissioner;
CAPTAIN HARPER; LIEUTENANT CORY;
HOLANCHUCK,

                                Defendants.

_____

**APPEARANCES:**                                      **OF COUNSEL:**

VINCENT BARROW
Plaintiff Pro Se
98-A-3967
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541

HON. ERIC T. SCHNEIDERMAN
Attorney General for the
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

GREGORY J. RODRIGUEZ, ESQ.
Assistant Attorney General

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Vincent Barrow ("Barrow"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty DOCCS employees, violated his rights under the First, Eighth and Fourteenth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Second Am. Compl. (Dkt. No. 50) , at 1-16. Presently pending is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12 (b) (6) and FED. R. CIV. P. 12 (b) (1). Dkt. No. 67. Barrow opposed. Dkt. No. 69. For the following reasons, it is recommended that (1) defendants' motion to dismiss under FED. R. CIV. P. 12 (b) (6) be granted in part and denied in part and (2) defendants' motion to dismiss under FED. R. CIV. P. 12 (b) (1) be dismissed.

### I. Background

The facts are related herein in the light most favorable to Barrow as the non-moving party. See subsection II(A) infra. At all relevant times, Barrow was an inmate at the Marcy

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636 (b) and N.D.N.Y.L.R. 72.3 (c).

Correctional Facility ("Marcy").

## A. Lewd Conduct Program

At Marcy, the Residential Mental Health Unit ("RMHU") had implemented "The Lewd Conduct Program" for inmates who had engaged in lewd behaviors. Second Am. Compl. ¶ 25. The program included use of a control suit, a neon-green jumpsuit that is laced up the back – its only opening – with heavy string and secured with a padlock at the neck. Id. Another component of the program is the placement of a sign that says "Exposer" above the inmate's cell door. Id. ¶¶ 26, 30.

Although Barrow was advised by defendants Joseph Bellnier, Deputy Commissioner of Program Service; Lieutenant Cory; Captain Harper; Bryan Hilton, Superintendent of Programs; Lisa Kalies, Unit Chief, Office of Mental Health, Residential Mental Health Unit; and B. McArdle, Deputy Superintendent of Marcy, that the lewd conduct program was imposed for security reasons, Barrow contends that he was discriminated against because other inmates who had smuggled in contraband by concealing it in their groin area were not placed into the program. Second Am. Compl. ¶¶ 27–28. Barrow has informed Bellnier; Hilton; and Bob Lewis, OMH Therapist of this claim. Id. ¶ 35. Barrow further alleges that the program participants are disproportionately minority inmates. Id. at 15. Hilton advised Barrow that the lock prevents him from ripping off the jumpsuit, but also serves to humiliate and "change" his "cognizence [sic]." Id. ¶¶ 42–43. Barrow argues that a lock at one's neck is a symbol of hate and oppression of minorities harkening back to times of slavery and racial segregation. Id. ¶ 42. Thus, Barrow states that the lewd conduct program is imposed not for security purposes, but to humiliate inmates and deter future exhibitionist conduct. Id. ¶¶ 34-35, 43.

3

On March 28, 2011, Barrow was made to the wear the jumpsuit after being issued a misbehavior report for lewd conduct. Second Am. Compl. ¶ 29. A disciplinary hearing was not held in connection with that report. Id. On or about November 10, 2011, Barrow was again ordered to wear the jumpsuit and have the exposer sign hang on his door for thirty days. Id. ¶ 30. A disciplinary hearing was held regarding this alleged violation. Id. More recently, Barrow was ordered to wear the jumpsuit in January 2013 and from July 17, 2013 to August 17, 2013. Id. ¶¶ 31, 71.

In December, 2011, Barrow notified RMHU staff that he had not had a hearing for the March 28, 2011 lewd conduct allegations. Second Am. Compl. ¶ 38. After submitting this complaint, Barrow began to receive more misbehavior reports for lewd conduct. Id. ¶ 39. Between September 2008 and May 2011, Barrow had received eighteen misbehavior reports for lewd conduct. Dkt. No. 50, at 23 (CORC Grievance Denial), 26 (same). Barrow also contends that he was issued misbehavior reports for repeatedly requesting a prison transfer and filing sexual harassment charges against staff members. Second Am. Compl. ¶ 41.

Barrow complained to defendants Anthony Devitto, Executive Director of Special Programming; Hilton; Michael Hoagan, Deputy Commissioner, Office of Mental Health, DOCCS; Kalies; Charles Kelly, Jr., Superintendent of Marcy; and Lewis that the lewd conduct program violated his rights under the Eighth Amendment and the ADA.[2] Second

---

[2] Barrow also alleges that his rights were violated under the Patients' Bill of Rights. Second Am. Compl. ¶ 33. However, a violation of state law does not implicate a federal right for purposes of a section 1983 action. Hanrahan v. Menon, No. 07-CV-610, 2010 WL 6427650, at *13 (N.D.N.Y. Dec. 15, 2010) (citations omitted) (finding claim of a violation under the Patients' Bill of Rights is not cognizable in a section 1983 action).

Am. Compl. ¶ 33.  Barrow contends his condition, which he claims to be exhibitionism, is confidential, and only inmates being treated for this condition should be privy to this information.  Id.  He suggests that the sign and jumpsuit deprive him of confidentiality.  Id.

Barrow is also upset that other inmates and staff ridicule and use racial epithets against him when he is in the jumpsuit.  Second Am. Compl. ¶¶ 32-33.  Barrow alleged that, on one occasion, in Hilton and Bellnier's presence, several inmates verbally insulted him regarding the jumpsuit, but neither defendant intervened.  Id. ¶ 32.

Barrow alleges that the lewd conduct program, as applied to him, is over broad because he is required to wear the jumpsuit even when there are no females present, despite the fact that he has no history of lewd conduct toward male employees.  Second Am. Compl. ¶ 34.  Because Barrow is made to wear the jumpsuit when no females are present, Barrow claims that the jumpsuit is not a security measure.  Id.

Because he is embarrassed by the jumpsuit, Barrow refused to wear it out of his cell. Second Am. Compl. ¶¶ 39, 42.  Barrow is concerned that his absence from programming has adversely affected his parole release date.  Second Am. Compl. ¶ 39.  He informed defendant Kenneth S. Perlman, Deputy Commissioner of Program Services, of his parole concerns.  Id. ¶ 59.   Due to his refusal to leave his cell in the jumpsuit, Barrow was unable to attend programs or his medical appointments.  Id. ¶ 36; see Dkt. No. 50 at 17–26 (prison documents pertaining to grievances filed and rulings on them).  Barrow also contends that because he lacks arches in his feet, he requires the use of a lift in his right shoe, "otherwise [he] is in severe pain up and down the right side of his back."  Reply (Dkt. No. 69), at 2.  Barrow has been unable to receive medical treatment for his foot because he would not go to his appointments while wearing the jumpsuit.  Id.

## B. Mental Diagnoses and Treatment

Barrow first arrived at RMHU with diagnoses of major depression and anti-social disorder and has since been diagnosed with poly-substance abuse. Second Am. Compl. ¶ 46. Three of Barrow's urine tests came back positive for cannabis, but he has never tested positive for any other substance; thus, he does not believe that poly-substance abuse is an accurate diagnosis. Id. Barrow contends that defendant Dr. Farago, his psychiatrist, attempts to "intellectually badger" him into wearing the jumpsuit; thus, he "only wished to talk about issues related to his profession" during their sessions. Id. ¶ 47. Shortly after telling Dr. Farago that he did not wish to discuss the lewd conduct program, Barrow's depression medication, which has been administered to him for approximately fifteen years, was terminated. Id. Barrow has since been "begging" for medication. Id. ¶ 48.

In or around May or June of 2011, Barrow filed a complaint against Dr. Farago to Kalies, stating that Dr. Farago was conducting meetings outside of his cell in violation of his right to privacy. Id. ¶ 49.[3] Although Barrow was told that in the future Dr. Farago would hold meetings in private, Dr. Farago would arrive at Barrow's cell, wait for him to get up, then walk away. Id. ¶ 50. Kalies indicated that the log book indicates that Barrow was seen by Dr. Farago; however, she did not permit Barrow review of the videotapes of those meetings. Id. ¶ 51. Barrow contends that, rather than treat him, Dr. Farago would turn

---

[3] To the extent that it can be inferred that Barrow asserts a violation of the physician-patient privilege, such a claim cannot be sustained. Because Barrow commenced this case as a section 1983 action, federal law applies. As federal law does not recognize the physician-patient privilege, this claim would also fail. Barnes v. Glennon, 9:05-CV-0153, 2006 WL 2811821, at *4-*5 (N.D.N.Y. Sept. 28, 2006).

away from the camera and make comical faces at him when he asked for his depression medication.  Id. ¶ 52.  Barrow alleges that defendants Devitto, Hoagan, Kalies, and Lewis were aware of his concerns regarding Dr. Farago because he wrote to them and spoke with them.  Id. ¶¶ 53–56.

Barrow alleges that the remaining defendants were involved in the alleged constitutional violations in various ways.  Bellnier and Hilton initiated the Lewd Conduct Program at Marcy.  Second Am. Compl.  ¶ 57.  Brian Fisher, Commissioner; Holanchuck; and Perlman were aware of Barrow's situation because he sent them letters and spoke with them.  Id. ¶¶ 58–59, 71.  Boll and LeClaire were aware of Barrow's concerns because he talked with them about the lewd conduct program.  Id. ¶¶ 60, 61.  E. Lindquist, Assistant Commissioner in charge of the programs at RMHU, knew about the program.  Id. ¶ 62.  Bellamy affirmed grievance determinations.  Id. ¶ 63.  Maureen Bossco, Executive Director of Central New York Psychiatric Center, and Jeff McKoy, Deputy Commissioner, were aware of the alleged constitutional violations because they spoke with him about the sign.  Id. ¶ 64.  Diane VanBuren, Deputy Commissioner, knew of Barrow's issues at RMHU because of her supervisory status.  Id. ¶ 70.

Most of the misbehavior reports issued against Barrow were written for exhibitionism, but Barrow was refused treatment for such.  Second Am. Compl. ¶¶ 66–68.  RMHU had demanded that Barrow attend a sex offender program, but Barrow thinks it is inappropriate for his disorder because the sex offender program focuses on pedophiles and rapists – conduct of which he was never convicted.  Id. ¶ 69.

Barrow seeks both compensatory damages and injunctive relief.  Second Am. Compl. at 16.

## II. Discussion[4]

Barrow contends that defendants violated his: (1) First Amendment rights by retaliating against him for his expression of protected speech; (2) Eighth Amendment rights by (a) subjecting him to cruel and unusual punishment, and (b) denying him medical treatment; (3) Fourteenth Amendment rights by (a) failing to provide him due process prior to imposing the lewd conduct program, (b) treating him differently from similarly-situated inmates, and (c) violating his right to privacy regarding his exhibitionism. Barrow also argues that defendants have violated the ADA and section 504 of the Rehabilitation Act.[5]

## A. Legal Standard

Under FED. R. CIV. P. 12 (b) (6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009). However, this

---

[4]    Barrow does not specify which defendants have personal knowledge of each alleged constitutional violations. It appears that Barrow intends to argue that each defendant had personal knowledge of each alleged constitutional violation (see Second Am. Compl. at 15 ("All defendants mentioned in these papers . . . has [sic] caused Plaintiff . . . to be deprived of the 14th and 8th amendment rights secured by the U.S.A. [C]onstitution. Also, the A.D.A. [t]itle II and section 504 of the Rehabilitation Act")). Where Barrow does not identify which defendants he brings each cause of action against, unless otherwise indicated, this report assumes that Barrow is alleging personal involvement of each constitutional violation upon each defendant.

[5]    All unpublished decisions are attached to this Report and Recommendation.

"tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (internal citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 680.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008 ) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally." (internal citations omitted)).

## B.  Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d

319, 323–24 (2d Cir. 1986)).[6]  Assertions of personal involvement that are merely

speculative are insufficient to establish a triable issue of fact.  See e.g., Brown v. Artus,

647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).


### 1.  Bossco and Fischer

Here, Barrow alleged in a conclusory fashion that Bossco and Fischer were (1) aware at

all times of his issues at Marcy and (2) that he spoke to them and sent several letters to

them about such issues.  Second Am. Compl. ¶¶ 58, 65.  The gravamen of Barrow's

complaints against these defendants is that they were in a position of power, thus, they

were involved with all aspects of his incarceration.  Nevertheless, attempts to establish

personal involvement based upon the supervisory role that these defendants occupied is

inappropriate.  Richardson v Goord, 347 F.3d 431 (2d Cir. 2003), quoting Ayers v

Coughlin, 780 F.2d 205, 210 (2d Cir. 1985) ("[M]ere 'linkage in the prison chain of

command' is insufficient to implicate a state commissioner of corrections or a prison

superintendent in a § 1983 claim.").

To the extent that Barrow seeks to establish defendants' knowledge of his complaints

through letters, such an attempt must also fail.  Until recently, a plaintiff's claim that he or

_____

[6]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal
decision has affected the five Colon factors which were traditionally used to determine
personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y.
2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir.
2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's
impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 182
(W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass
Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010)
(disagreeing that Iqbal eliminated Colon's personal involvement standard).

she sent a letter or grievance to a defendant, where the defendant did not take action on the letter or respond, was generally insufficient at the pleading stage to establish notice and personal involvement.  Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."; but see Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  However, the Second Circuit recently concluded that,

> [a]t the pleading state, even if [plaintiff] had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference – if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means – that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [plaintiff] complained

Grullon v City of New Haven, 720 F.3d 133, 131 (2d Cir. 2013); see also Toliver v. City of New York, 530 F. Appx. 90, 93 (2d Cir. 2013) (citing Grullon, 720 F. 3d at 141-42); Ferrer v. Fischer, No. 9:13–CV–0031, 2014 WL 1763383 (N.D.N.Y May 1, 2014).  Barrow does not provide sufficient factual detail to support his claim that the letters establish personal involvement.  He does not allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them.  Thus, he has not established personal involvement through the sending of letters.  Grullon, 720 F. 3d 133 at 141-42.

12

Further, although Barrow alleged that he had spoken with the defendants, Barrow does not state when these conversations took place. Eldridge v. Kenney, No. 11–CV–6459, 2014 WL 2717982, at *3 (W.D.N.Y. June 16, 2014) ("While Plaintiff's Response . . . contains references to the . . . Colon factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the Colon factors and are wholly unsupported by facts."). Moreover, Barrow presents no factual allegations to support a claim that defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Barrow's rights. Colon, 58 F.3d at 873. Thus, Barrow has failed to plausibly allege that Bossco or Fischer had personal knowledge of the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

### 2. Harper, McArdle, and VanBuren

Barrow has also failed to establish personal involvement of Harper, McArdle, and VanBuren in the alleged constitutional violations. Barrow states that VanBuren was aware of the violations because she "was at all times aware of the actions and functions . . . at the RMHU." Second Am. Comp. ¶ 70. Similarly, Barrow alleged that Harper knew about all programs at RMHU and, during a conversation, Harper told him that the lewd conduct program was implemented as a security measure. Id. ¶¶ 23, 27. Barrow contends that McArdle, as a "higher-up," advised him that the jumpsuit was imposed for security and failed to issue him a review notice for the lewd conduct program. Id. ¶¶ 27, 44.

With respect to the alleged conversations with Harper and McArdle, Barrow fails to provide details such as the date and manner of such conversations, rendering his claim

insufficient to establish the requisite knowledge for personal involvement.  See Eldridge,
2014 WL 2717982, at *3 (conclusory allegations are insufficient).  Instead, Barrow merely
contends that the lewd conduct program was discussed.  See Barnes v. Prack, No.
11–CV–857, 2012 WL 7761905, at *5 (N.D.N.Y. Sept. 7, 2012) (same).
To the extent that Barrow's complaint may suggest that Harper, McArdle, and VanBuren
allowed for the continuance of a unconstitutional policy or custom, he does not
demonstrate that defendants had investigated the program, were aware of his specific
concerns and complaints regarding the jumpsuit and sign, or that they otherwise
participated in decision making, policy making, or had any input relating to the alleged
constitutional violations.

    Furthermore, as noted, personal involvement cannot be established solely upon a
defendant's supervisory role.  Wright, 21 F.3d at 501.   As such, Barrow has failed to
plausibly allege the personal involvement of either Harper, McArdle, or VanBuren.
Accordingly, defendants' motion on this ground should be granted.


### 3.  Holanchuck, Perlman, LeClaire, Boll, and McKoy

    Barrow has similarly failed to demonstrate the personal involvement of Holanchuck,
Perlman, LeClaire, Boll, and McKoy.  Barrow essentially argues that these defendants had
personal knowledge of the alleged constitutional violations because (1) he spoke with
them about the lewd conduct program and/or its negative effect on him and (2) they held
supervisory positions at Marcy yet failed to address his concerns.  Specifically, Barrow
argues that Holanchuck had personal knowledge of the alleged violations because Barrow
"had many talks with Defendant about the violation of plaintiff['s] rights, all to no avail."  Id.

14

¶ 71.  In response, Holanchuck told him that the lewd conduct program "was being done in other states." Id.  Barrow also indicates that Holanchuck, as Deputy Commissioner, "was aware of all actions and functions here at the RMHU," and, thus, responsible due to his supervisory position.  Id.

Barrow contends that LeClaire knew of the alleged violations because "Plaintiff talked to him about the "outright shocking racist presentment of this Lewd Conduct Program." Second Am. Compl. ¶¶ 22, 60.   However, Barrow's reference to a conversation with LeClaire wherein he expressed his belief that the lewd conduct program was implemented in a racially-discriminatory manner does not demonstrate that LeClaire was aware of the personal affect the program had on Barrow.

Barrow states that Perlman "knew at all times [about the] situation" as he spoke to Perlman of "the need of programs to gain parole" and, in response, Perlman told him that "he should program in spite of the Control suit." Second Am. Compl. at 59.  Barrow also argues that he spoke with Boll "upon visiting the RMHU" and that, as Deputy Commissioner, she "was in [a] position to stop and had the duty to stop the violation of plaintiff['s] 14th and 8th Amendments [sic]" Id. ¶ 61.  Barrow additionally alleges that he spoke with McKoy about the "exposer" sign, yet McKoy allowed the sign to remain.  Id. ¶ 64.

Barrow's passing references to conversations he alleges to have had with Holanchuck, Perlman, LeClaire, Boll, and McKoy are insufficient to establish their personal involvement.  Barrow fails to specify when he had such discussions with defendants. Further, Barrow's attempts to establish personal involvement based upon the supervisory role the defendants occupied must fail.  Wright, 21 F.3d at 501.

15

Accordingly, defendants' motion on this ground should be granted.

### 4. Bellamy

Barrow argues that Bellamy, as Director of the Inmate Grievance Program, violated and was "in gross deliberate indifference to [his] 8[th] and 14th Amendments [sic]." Second Am. Compl. ¶ 63. He contends that defendant Bellamy was aware of these alleged violations because he "appealed many grievances" to her, which she affirmed. Id. Merely affirming the denial of a defendant's grievance is insufficient to establish personal involvement, without more. See Thomas v. Calero, 824 F. Supp. 2d 488, 505–11 (S.D.N.Y. 2011) (concluding that affirming *and modifying* the penalty imposed in an allegedly constitutionally infirm disciplinary proceeding can satisfy the second Colon factor). Moreover, insofar as Barrow appears to claim personal involvement based on defendant's status as a director, this does not establish that she was personally involved with the alleged Eigth Amendment violations. Wright, 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.

### 5. Lindquist

Barrow argues that Lindquist, due to his supervisory role as Assistant Commissioner, was aware of the Lewd Conduct Program and "the grave harm it was doing" to him. Second Am. Compl. ¶ 62. Inasmuch as Barrow suggests that Lindquist was aware of the alleged violations because of his supervisory position, as noted, attempts to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. Wright, 21 F.3d at 501. Barrow further argues that the fourth Colon factor

is implicated.  He contends that Lindquist "was grossly negligent in that he did not adequately supervise the subordinates who violated Plainiff['s] 14th and 8th Amendment [rights]." Second Am. Comp. ¶ 62.  However, Barrow does not provide any support for his claim that Lindquist negligently supervised his subordinates.   Such a conclusory reference to a Colon factor is insufficient to support a claim of personal involvement.  Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim . . . [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (internal citations omitted)).  Inasmuch as Barrow suggests that defendant was aware of the alleged violations because of his supervisory position, as noted, an attempt to establish personal involvement based upon the supervisory role defendant occupied is inappropriate.  Wright, 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.


### C. Eleventh Amendment

Barrow brings all claims against all defendants in their official and individual capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the

absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  See Quern v. Jordan, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir.1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)).  "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer.  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Insofar as Barrow demands money damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS, these claims are barred by the Eleventh Amendment. Id. at 169.

Accordingly, Barrow's claims for money damages pursuant to section 1983 against all defendants in their official capacities should be dismissed.


### D.  First Amendment

Barrow argues that expressing his concern over the lewd conduct program, requesting prison transfers, and filing sexual harassment charges against staff members is protected speech, and defendants filed false misbehavior reports against him in retaliation for his exercise of this speech.

Courts are to "approach  [First Amendment] retaliation claims by prisoners with

18

skepticism and particular care." See e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (citing Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, NA, 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. Ashcroft, 556 U.S. at 678; South Cherry St. LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009). However, a retaliation claim may survive a defendant's motion to dismiss if a plaintiff alleges facts tending to establish that "(1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action." See Jones v. Harris, 665 F.Supp.2d 384, 398 (S.D.N.Y. 2009). Adverse action has been defined objectively as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004). Further, an inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. Boddie v Schenider, 105 F.3d 857, 862 (2d Cir. 1997). Thus, to the extent that a plaintiff seeks damages because "he was subjected to an accusation that turned out not to stand up under scrutiny," such would not be an actionable claim under section 1983. Jones v Harris, 665 F. Supp.2d 384, 400 (S.D.N.Y. 2009).
Thus, Barrow fails to present a prima facie claim for a violation of his First Amendment rights.

    First, it does not appear that Barrow's transfer requests were constitutionally-protected speech as an inmate has no constitutional right to be housed in a facility of his choosing.

See generally, McMahon v Fischer, 446 Fed. Appx. 354 (2d Cir. 2011) ("A prisoner has no right to housing in a particular facility"). Although complaining about the lewd conduct program and filing good-faith sexual harassment charges are constitutionally-protected activities (Carl v Dirie, No. 9:09-CV-724, 2010 WL 3338566 at *5 (N.D.N.Y. Mar. 29, 2010) (quoting United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967) ("The Supreme Court has noted that the right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights'")), Barrow's claim is wholly conclusory. He does not state which of the named defendants filed misbehavior reports against him, when most of these alleged misbehavior reports were filed, the temporal proximity between the constitutionally-protected behaviors and the misbehavior reports, the prison rule violations with which he was charged, or whether any action was taken as a result of the misbehavior reports filed against him. Second Am. Compl. ¶ 41; cf. Shaheen v McIntyre, No. 9:05-CV-0173, 2007 WL 3274835 at *9 (N.D.N.Y Nov. 5, 2007) (plaintiff demonstrated adverse action was taken by contending misbehavior reports were filed against him in retaliation of his exercise of speech, resulting in several days of keeplock confinement); see also Mateo v Fischer, 682 F. Supp.2d 423, 435 (S.D.N.Y. 2010) (filing of misbehavior report one day after prisoner filed sexual harassment grievance against corrections officer was sufficiently close in time to support causation element in retaliation claim). Furthermore, because Barrow does not specify which charges were filed against him in the misbehavior reports, he fails to demonstrate that the issuance of misbehavior reports was causally connected to his

protected speech rather than an actual violation of prison rules.[7]  See Lowrance v Achtyl, 20 F. 3d 529, 535 (2d Cir. 1994) (When it is undisputed that an inmate committed the prohibited conduct, no retaliatory discipline claim can be sustained)).

Although Barrow contends that, "[w]hen and if [he] gets his day in Court, records of inmates misbehavior reports can easily inform the Courts of any information it may need," his conclusory claims as presented in his complaint are insufficient to withstand a motion to dismiss.  Reply, at 3; DeLeon v Wright, No. 10–CV–863, 2012 WL 3264932, at *7 (N.D.N.Y July 5, 2012) (citing Flaherty v Coughlin, 713 F. 2d 10, 13 (2d Cir. 1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone")).

Accordingly, defendants' motion on this ground should be granted.

### E.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. AMEND. VIII.  The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  Farmer v. Brennan, 511 U.S. 825, 834 & 837 (1994); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994).  A viable Eighth Amendment claim is twofold; the plaintiff must demonstrate both objective and subjective components.  The objective question asks whether the deprivation of which the inmate complains was sufficiently serious.  Farmer, 511 U.S. at 834.  This component "requires a

---

[7]  Indeed, Barrow concedes that he has had incidents of exposure while incarcerated.  Dkt. No. 50, at 18.

court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Thus, the prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." <u>Helling v. McKinney</u>, 509 U.S. 25, 36 (1993). The subjective component requires the inmate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. <u>Farmer</u>, 511 U.S. at 834.[8] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837.

The Supreme Court has held that "[p]rison administrators . . . be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Whitley v Albers</u>, 475 U.S. 312, 321-22 (1986) (internal quotation marks and citation omitted). However, although "the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities . . . [d]isciplinary measures that violate civilized standards of human decency are proscribed." <u>LaReau v MacDougall</u>, 473 F.2d 974, 978 (2d Cir. 1972).

---

[8] The United States Supreme Court has held that "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in <u>Estelle [v.Gamble]</u>." <u>Wilson v Seiter</u>, 501 U.S. 294, 303 (1991).

22

**1. Conditions of Confinement**

Addressing the objective component of the analysis, the alleged deprivation Barrow raises appears to raise is his denial of right to be free from humiliation, shaming, and verbal harassment from other inmates and staff. Barrow argues that he was subjected to cruel and unusual punishment because defendants forced him to wear the jumpsuit and have the exposer sign positioned above his cell door as a means to humiliate him and to perpetuate racism, rather than for genuine security concerns. Second Am. Compl. ¶¶ 34, 43, at 15. Barrow also contends that the jumpsuit makes him a target for verbal assaults and racially-fueled remarks from other inmates and staff. Id. at 15; Reply at 4. Barrow appears to argue that because the lock symbolizes oppression of African-Americans, being forced to wear it causes him grave harm, such as stress, reduced self-esteem, and "depression brought on top of [the] normal depression Plaintiff suffers from." Second Am. Compl. ¶ 40. Finally, Barrow states that the weight of the lock on the back of the jumpsuit requires him to continuously adjust the collar of the jumpsuit to "keep from being slowly choked." Reply at 1-2.

Barrow does not provide the names of any staff members who have verbally assaulted him while he was in the jumpsuit. Although Barrow states that defendants Bellnier and Hilton failed to intervene on one occasion where he was being harassed by inmates in their presence (Second Am. Comp. ¶ 32), there is no constitutional right to be free from verbal assault. Lunney v Brureton, No. 04-Civ.-2438, 2005 WL 121720, at *11 (S.D.N.Y. Jan. 21, 2005) ("general allegations of threats and harassment are insufficient to state a claim because comments that are merely insulting or disrespectful do not give rise to a

constitutional violation") (internal citations and quotation marks omitted); see also Cuoco v Mortisugu, 222 F.3d 99, 109 (2d Cir. 2000). Thus, although infliction of mental anguish may sometimes rise to the level of cruel and unusual punishment (see e.g. Hudson v McMillian, 503 U.S. 1, 16 (1992) (Blackmun, J., concurring)), it appears that the racially-fueled harassment Barrow has faced from fellow inmates and some staff while wearing the jumpsuit – even if it impacts his depression and lowers his self-esteem – does not amount to a disregard of an "excessive risk" to his safety and health. Farmer, 511 U.S. at 837; Jabbar v Fischer, 683 F.3d 54, 57 (2d Cir. 2012).

Further, the physical discomfort of the lock pulling on the collar of the jumpsuit appears to be little more than an annoyance that is easily alleviated by adjusting the collar. There is no evidence that the padlock poses an excessive risk of serious injury. A de minimus discomfort is not a violation of an inmate's Eighth Amendment rights. See e.g. Kearney v N.Y.S. D.O.C.S., No. 9:11-CV-1281, 2013 WL 5437372, at *12-13 (N.D.N.Y. Sept. 27, 2013) (a long walk to recreational yard, which caused discomfort for mobility-impaired inmate, along with bathroom facilities that required the plaintiff to lean in uncomfortable manner while using them, were not sufficient to rise to Eighth Amendment violations).

Accordingly, defendants' motion to dismiss on this ground should be granted.


### 2. Medical Indifference

Next, Barrow appears to contend that he was denied access to adequate medical care because (1) he was denied treatment for exhibitionism, (2) Dr. Farago refused to provide him with treatment for depression, (3) he was refused his depression medication, and (4) he was unable to attend medical appointments for a foot condition.

24

The Eighth Amendment extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  "'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9  (1992)).   What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185. In claims for inadequate medical care, to satisfy the subjective component, the plaintiff must prove that defendant acted with deliberate indifference.  Deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).   "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.

### a.  Denial of treatment for Exhibitionism

Barrow contends that, despite the fact that most of the misbehavior reports filed against

him are for exhibitionism, defendants have "refused to treat Plaintiff for the disorder."

Second Am. Comp. ¶ 67.  Assuming Barrow can establish that he suffers from

exhibitionism, he must demonstrate that "a reasonable doctor or patient would find it

important and worthy of comment," that the condition significantly affects his daily

activities, or the condition causes him chronic and substantial pain.  Chance, 143 F.3d at

702 (internal quotation marks and brackets omitted).  Although Barrow alleges that being

made to wear the jumpsuit significantly impacts his daily activities, he does not

demonstrate that the condition of exhibitionism itself significantly affects his daily activities

or causes him chronic and substantial pain.  Id.  Although Barrow suggests that

exhibitionism is "a living hell," he alleges that he was able to attend medical appointments

without having any incidents of exposure; does not display exhibitionist tendencies toward

males, and notes that there are often no females near him; and that he functions in the

prison community for months at a time without lewd conduct infractions.  Second Am.

Compl. ¶¶ 34, 41-42; Dkt. No. 50, at 17; Id. at 25.  Moreover, Barrow does not contend

what harm, if any, the alleged inadequacy in treatment has caused or will likely cause him,

beyond noting that a lack of programming has negatively impacted his parole date.[9]

---

[9] Barrow did not include a claim regarding any of his parole concerns in the instant
complaint.  Even if he had, such claims should be dismissed.  The Supreme Court has
held that

> while there is no constitutional or inherent right of a convicted
> person to be conditionally released before the expiration of a
> valid sentence, a state's authority scheme, if it uses mandatory
> language, creates a presumption that parole release will be
> granted when or unless certain designated findings are made,
> and thereby gives rise to a constitutional liberty interest.

Robles v. Dennison, 745 F. Supp. 2d 244, 263 (W.D.N.Y. 2010) (citing Greenholtz v.
Inmates of the Nebraska Penal and Corr. Complex, 442 U.S. 1, 7 (1979); Board of

Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (in determining whether a condition is sufficiently serious, a court is to examine how the omission in medical treatment has caused, or will likely cause, harm to inmate).

Even assuming exhibitionism is a sufficiently serious medical condition, Barrow fails to demonstrate that defendants acted with deliberate indifference to his exhibitionism. Although Barrow contends that he was intentionally denied programming and treatment for exhibitionism, as he was only offered sex offender programming, he did not demonstrate that the programming offered had no relevance to his alleged conditions. Further, insofar as could be discerned, at some point, defendant Farago attempted to discuss the jumpsuit and lewd conduct program with Barrow, but Barrow refused to discuss it. Id. ¶ 47. Disagreement over the appropriate programming is an insufficient basis for a section 1983 claim, so long as the treatment offered is adequate. Chance, 143 F. 3d 698 at 703. Moreover, to the extent that Barrow contends that he was denied access to all programming at Marcy, Barrow refused to leave his cell because of the jumpsuit. Second Am. Compl. ¶ 39, 42. Thus, any denial of programming was a direct result of his refusal to leave his cell.

Accordingly, defendants motion, insofar as it seeks to dismiss the claim of medical indifference to Barrow's exhibitionism should be granted.

---

Pardons v. Allen, 482 U.S. 369, 371 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. Barna v. Travis, 239 F.3d 169, 170–71 (2d Cir. 2001) (citing Greenholtz, 442 U.S. at 11–13). Because Barrow cannot allege that he has a liberty interest in his parole, to the extent that he has attempted, he has failed to state a due process claim.

### b. Denial of treatment for depression

Barrow also contends that he was denied treatment for depression in violation of the Eighth Amendment. Little case law exists discussing whether depression is a sufficiently serious medical condition for Eighth Amendment purposes; however, it appears that mental disorders are considered serious medical needs. See generally Zimmerman v. Burge, No. 06-CV-80, 2009 WL 9054936, at *6 (N.D.N.Y. Apr. 20, 2009), "treatment of mental disorders of mentally disturbed inmates is . . . a serious medical need"; Hamilton v Smith, No. 06–CV–805, 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009) (same). Although Barrow provides little insight into the severity of his depression and how it impacts his daily activities, he contends that he received treatment and was medicated to alleviate these mental health symptoms for fifteen years. Second Am. Compl. ¶ 47. Taking these allegations as true, Barrow has alleged a sufficiently serious medical need as it necessitated medical and pharmacological intervention for a sustained and continuous period of time. Such a condition was clearly "perceived by a reasonable physician as important and worthy of comment . . . ." Randle v Alexander, 940 F. Supp 2d 457, 481 (S.D.N.Y. 2013) (internal quotation marks and citation omitted). Thus, Barrow has satisfied the first prong of the Eighth Amendment analysis.

Next, Barrow must demonstrate defendants' deliberate indifference to his depression. Barrow states that he was denied therapy because defendant Farago pretended to treat him cell-side. Farago would "come to [Barrow's] cell, wait for [him] to get up to come to the gate and then walk away." Second Am. Compl. ¶¶ 50-51. Further, Barrow states that Farago "changed" his diagnosis of Major Depressive disorder and Anti-social disorder to poly-substance abuse, despite having only three positive urinalysis tests for cannabis in

the past 15 years.  Id. at 46.  Farago also stopped providing Barrow's depression medication, which he had been taking for over 15 years.  Id. ¶ 46.  When Barrow "begged" for his medication, Farago would make "comical faces" at him while facing away from the camera.  Id. ¶ 52.  Assuming Barrow has a current diagnosis of depression and that the allegations against Farago are true, a complete denial of therapy and sudden cessation of medication that he had been taking for fifteen years could pose a risk of serious harm to his mental well-being.  Brock, 315 F.3d at 162–63.

Accordingly, defendants' motion to dismiss the medical indifference claim relating to the denial of treatment for depression, should be denied.


### 3.  Denial of treatment for foot arches

Insofar as Barrow argues that defendants denied his access to medical treatment for his foot arches, this claim must fail.  Even assuming Barrow's need for use of a shoe lift is a serious medical condition, Barrow was not denied medical treatment for his foot condition due to defendants' deliberate indifference to the condition, but for his choice to remain in his cell, rather than attend his appointment in the jumpsuit.  See generally Hardy v. Diaz, No. 9:08-CV-1352, 2010 WL 1633379, at *6 n. 12 (N.D.N.Y. Mar. 30, 2010) (noting that skipping medical appointments and failing to comply with treatment directions can undermine an Eighth Amendment medical indifference claim).

Accordingly, any claim against defendants for a denial of treatment for Barrow's foot condition should be dismissed.

F. **Fourteenth Amendment**

1. **Procedural Due Process Claim**

Barrow argues that he was denied procedural due process because he was required to wear the jumpsuit after a lewd conduct misbehavior report was filed against him, but before a disciplinary hearing was held. Insofar as can be ascertained from his complaint, although a disciplinary hearing was held on at least one of the misbehavior reports, the lewd conduct program was never discussed as a part of his punishment. Second Am. Comp. ¶ 30.

To prevail on a procedural due process claim, "a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir.1998). However, the Supreme Court has held that such liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995); Marino v Klages, 973 F. Supp. 275 (N.D.N.Y. 1997).

Here, Barrow fails to demonstrate that he was deprived of a cognizable liberty interest. Although Barrow states that he was held in his cell for a collective period of at least three months, he concedes that he independently made the conscious decision to refuse to leave his cell even though defendants permitted him to leave his cell in the jumpsuit. Barrow does not allege that he was otherwise restrained while wearing the jumpsuit. Similarly, defendants did not prevent him from attending programs while he was wearing the jumpsuit. In his grievance, which is incorporated by reference, Barrow states that he

was offered the option of being "bonded to the restart chair, in 4 points" as an alternative to attending programming in the jumpsuit; however, he rejected this option as a "baric [sic] medieval form of bondage and sadism." Dkt. No. 50, at 25. Any lack of access to programming or services was self-imposed.[10] Thus, although Barrow was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting Barrow's movement. Therefore, Barrow failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Sandin, 585 U.S. at 484.

Additionally, although Barrow may not have been granted a hearing before the imposition of the lewd conduct program, it appears that the jumpsuit and sign were implemented as a necessary security measure. Here, defendants are charged with the responsibility of ensuring the safety of the prison staff, personnel, visitors, and inmates. "A prison regulation that inadvertently impinges on prisoners' constitutional rights is valid "'if it is reasonably related to legitimate penological interests,' such as 'deterrence of crime, rehabilitation of prisoners, and institutional security'" Davis v City of New York, 142 F. Supp. 2d 461, 463 (S.D.N.Y. 2001) (quoting Turner v Safley, 482 U.S. 78, 79 (1987)). Because the jumpsuit and sign serve to prevent inmates with a history of exposure and public masturbation from committing such acts, and Barrow has an extensive history of such conduct, Barrow fails to create an issue of fact as to whether defendants were deliberately indifferent to a serious risk of harm when requiring his participation in the lewd

---

[10] Insofar as Barrow complains that his failure to attend programming negatively impacted his parole date, as noted (supra n. 8), even if this statement were sufficient to raise a denial of a liberty interest claim, such claim must fail, as there is no due process interest in parole. See Barna, 239 F.3d at 170-71.

conduct program.  <u>Whitley</u>, 475 U.S. at 319.  Barrow admitted that he has exposed himself

repeatedly, and that this is a "compolsive [sic] habit." Dkt. No. 50, at 25.  Thus, even

assuming that Barrow had a protected liberty interest, legitimate security concerns

outweigh this interest.  <u>Id.</u>; <u>Turner</u>, 482 U.S. at 79.

    Accordingly, defendants motion to dismiss the complaint on these grounds should be

granted.


## 2.  Right to Privacy

    Finally, Barrow argues that defendants violated his right to privacy.  The basis for

Barrow's claim on this ground is that the jumpsuit and sign expose his medical condition to

other inmates, visitors, and prison personnel.  It is not clear whether he raises this claim

under the Eighth or Fourteenth Amendment.  Second Am. Compl. ¶ 33; Reply, at 4.

Generally, the right to privacy is based on the "Fourteenth Amendment's concept of

personal liberty and restrictions upon state action," (<u>Whalen v. Roe</u>, 429 U.S. 586, 598 n.

23 (1977); <u>Nolley v. County of Erie</u>, 776 F.Supp. 715, 729 (W.D.N.Y. 1991)); however,

claims relating to the disclosure of confidential medical information have also been

reviewed under the Eighth Amendment.[11]  <u>See</u> <u>generally</u> <u>Rodriguez v. Ames</u>, 287 F. Supp.

2d 213, 218-21 (S.D.N.Y. 2003).   The Supreme Court has recognized "that there exists in

the United States Constitution a right to privacy protecting 'the individual interest in

avoiding disclosure of personal matters,'" including "'the right to protection regarding

_____

    [11]  To avoid repetition or confusion, to the extent Barrow may raise privacy claims
under both the Eighth and Fourteenth Amendment, they will both be discussed in this
section of the Report.

information about the state of one's health.'" <u>Powell v Schriver</u>, 175 F.3d 107, 111 (2d Cir. 1999) (quoting <u>Whalen</u>, 429 U.S. at 599). An inmate may prove a constitutional entitlement to protection from needless disclosure of a private medical condition if he demonstrates that (1) he suffers from an unusual or sensitive medical condition; and (2) if such condition were disclosed unnecessarily, he could be subjected to discrimination, intolerance, or violence. <u>Id.</u> at 111. The interest an inmate has in the privacy of his or her medical condition varies, depending on the condition. <u>Williams v. Perlman</u>, No. 9:06–CV–00936, 2009 WL 1652193, at *10-11 (N.D.N.Y. Feb. 5, 2009) (citing <u>Rodriguez</u>, 287 F.Supp. 2d at 229 (holding no qualified right to privacy in inmate's psychiatric condition and treatment)). Although disclosure of such a medical condition may, in some circumstances, be viewed as reasonably related to legitimate penological concerns, gratuitous disclosure may be a violation of privacy. <u>Id.</u> at 111-12 (discussing that disclosure of private medical condition for purpose of humor and gossip serves no legitimate penological interest and violates inmate's constitutional right to privacy).

### a. Fourteenth Amendment Right to Privacy

Here, assuming Barrow can prove that he has been diagnosed with exhibitionism, he fails to demonstrate that exhibitionism is a condition on-par with HIV or transsexualism – conditions that other courts have found sufficient to trigger a constitutional right to privacy. <u>Compare</u> <u>Powell</u>, 175 F.2d at 112-13 (transsexualism protected); <u>Doe v. City of New York</u>, 15 F.3d 264, 266-67 (2d Cir. 1994) (HIV-positive status protected); <u>Fleming v. State Univ. of New York</u>, 502 F. Supp. 2d 324, 343 (E.D.N.Y. 2007) (sickle cell amenia protected), <u>with</u> <u>Hamilton v. Smith</u>, No. 9:06-CV-805, 2009 WL 3199531, at *15 (N.D.N.Y. Jan. 13,

2009), adopted as modified by 2009 WL 3199520 (N.D.N.Y Sept. 30, 2009) (Hepatitis A

not protected), and Wilson v. Brock, No. 9:06-CV-528, 2008 WL 4239564, at *5

(participation in drug or alcohol rehabilitation not protected).  Further, Barrow has not

plausibly demonstrated that the prison community's knowledge of this condition could lead

to discrimination, intolerance, or violence.  Powell, 175 F.3d at 111.  Although Barrow

contends that he has suffered discrimination, harassment, and intolerance from fellow

inmates, as noted, his complaint attributes this disparate treatment to the racist sentiment

that the lock on the jumpsuit triggers, not the condition of exhibitionism itself.  Second Am.

Compl. at 15.  Thus, although exhibitionism could arguably be considered sensitive

medical information due to the nature of the condition, because Barrow has not

demonstrated that he faced or would likely face harm as a direct result of public

knowledge of his alleged condition, he has failed to plausibly argue that defendants

violated a constitutional right by revealing this condition to others through use of the lewd

conduct program.  Cf. Powell, 175 F.3d at 112 (disclosure of inmate's status as

transsexual and HIV positive could place inmate at risk "especially given that, in the

sexually charged atmosphere of most prison settings, such disclosure might lead to

inmate-on-inmate violence.").

Additionally, although the lewd conduct program reveals to the prison community the

fact that the Barrow exposes himself, Barrow does not demonstrate that the program is

needless.  Defendants have demonstrated that there are significant penological interests

in the sign and jumpsuit – to prevent Barrow from exposing himself and to warn others of

his proclivity to do so, which, as Barrow stated, is a compulsive behavior.  Dkt. No. 50, at

25.  When a prison regulation impinges on inmates' constitutional rights, the regulation is

valid if reasonably related to legitimate penological interests.  <u>Turner</u>, 482 at 89.  <u>Turner</u>

identified four factors to consider in making this determination:

> First, there must be a "valid, rational connection" between the
> prison regulation and the legitimate governmental interest put
> forward to justify it . . . . Moreover, the governmental interest must
> be a legitimate and neutral one . . . . A second factor
> . . . is whether there are alternative means of exercising the right
> that remain open to prison inmates . . . . A third consideration is the
> impact accommodation of the asserted constitutional right will have
> on guards and other inmates, and on the allocation of prison
> resources generally . . . . Finally, the absence of ready alternatives
> is evidence of the reasonableness of a prison regulation . . . . By
> the same token, the existence of obvious, easy alternatives may be
> evidence that the regulation is not reasonable . . . .

482 U.S. at 89–90 (quoting <u>Block</u>, 468 U.S. at 586).

Under the <u>Turner</u> analyis, it is clear that there is a valid and logical connection between

mandating that offending inmates wear the jumpsuit – the inhibition and prevention of an

inmate's ability to expose himself – and the prison's interest in maintaining institutional

safety and security – preventing offending inmates from engaging in hostile, harassing, or

sexually abusive behaviors in the prison community.  <u>Id.</u> Next, there does not appear to be

a less restrictive alternative to the jumpsuit.  Absent the jumpsuit, in order to control

compulsive acts of exposure and public masturbation, prisons would presumably have to

resort to segregation or isolation of these inmates.  <u>Id.</u>  Segregation and isolation is not

preferable to the lewd conduct program, which allows inmates to remain a part of the

general prison population.  In addition, the lewd conduct program as a <u>de</u> <u>minimus</u> impact

on participating inmates.  Although there exists a relatively minor discomfort for inmates,

as discussed <u>supra</u>, the inmates are not restricted in their movement.  Further, this ability

to manage the conduct of inmates who demonstrate exhibitionist behavior, prison guards

and other inmates would remain at risk of being subjected to this sexual misconduct.  Id.

Thus, for the reasons previously discussed, because the lewd conduct program is

reasonable and there are no less restrictive "ready alternatives," the lewd conduct program

is valid.  Id. at 90.

Accordingly, defendants' motion to dismiss under the due process clause of the

Fourteenth Amendment should be granted.


### b.  Eighth Amendment Right to Privacy

Barrow also appears to argue that he was denied his right to privacy of his exhibitionism

under the Eighth Amendment.  As noted, it does not appear that Barrow's claim of

exhibitionism demonstrates a sufficiently serious medical need.  However, even if this

condition constituted a serious medical need, the disclosure of the fact that Barrow

exposes himself does not constitute deliberate indifference.  As these measures were put

in place to restrict Barrow's ability to expose himself and warn and protect others from

being victimized this conduct, the lewd conduct program was limited enough in scope and

purpose.  See generally Hamilton, 2009 WL 3199531, at *15 (disclosure of medical

condition was not deliberate indifference where disclosures were limited in scope and

purpose and were necessary to investigate a grievance).

Accordingly, defendants motion to dismiss should be granted on this ground.


### 2. Equal Protection

Barrow argues that he was denied equal protection because (1) inmates who have

smuggled in drugs or weapons in their groin did not have to wear the jumpsuit, (2) inmates

36

who kick or spit on staff are not made to wear relevant restrictive devices, and (3) a disproportionate number of minorities were made to participate in the lewd conduct program.

To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005). Barrow fails to demonstrate that similarly-situated inmates are treated differently. Despite Barrow's contention, inmates who have smuggled in drugs or weapons in their groin-area are not similarly situated to Barrow. Similarly, inmates who spit on or kick staff are also not similarly situated to him. Although inmates who smuggle in contraband by concealing it in their groin may pose a security risk, this risk differs from that presented by an inmate who compulsively exposes his genitals to staff, visitors, and other inmates. As such, those inmates do not necessarily require the same security measures to be taken. Because Barrow does not argue that other inmates who have exposed themselves were excused from participation in the lewd conduct program, he has failed to state a claim for an equal protection violation. See Id.

Finally, Barrow fails to plausibly argue that the lewd conduct program is intentionally made up of a disproportionate number of minorities. Reading the facts in the light most favorable to him, Barrow presents no evidence to support his argument that racial minorities who have exposed themselves are being treated differently from Caucasian or other inmates who have committed the same lewd conduct infractions. See Id. at 129 (2d Cir. 2005) ("[t]o prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of

37

intentional discrimination").

Accordingly, defendants' motion to dismiss on this ground should be granted.

### G. Americans with Disabilities Act and Rehabilitation Act

Barrow argues that defendants violated the ADA and RA because the lewd conduct program improperly exposes his medical condition – exhibitionism – to members of the prison community.  Second Am. Compl. ¶ 33.  He contends that the lack of confidentiality regarding his exhibitionism has resulted in "scorn and ridicule and verbal assaults of all kind [sic]." Id.  It appears that Barrow contends that the denial of programming or treatment for his exhibitionism also violates the ADA and RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of  . . . a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity

Byng v Campbell, No. 907-CV-471, 2010 WL 681374, at * 17 (quoting Clarkson v. Coughlin, 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)); 42 U.S.C. § 12132.  Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, ... [or] denied the benefits of," any federally-funded

38

program "solely by reason of his or her disability . . . ." 29 U.S.C. § 794(a); see also Clarkson, 898 F.Supp. at 1037-38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").

For multiple reasons, Barrow fails to plausibly state a claim. First, Barrow cannot satisfy the first prong of the analysis. Barrow contends that his disability is exhibitionism; however, Barrow presents no evidence that his exhibitionism is anything other than self-diagnosed. The complaint provides that his diagnosed conditions were major depressive disorder, anti-social disorder, and poly-substance abuse. Second Am. Compl. ¶ 46. Moreover, exhibitionism is specifically excluded from consideration as a disability under the ADA. 42 USC § 12211(b)(1). Thus, Barrow is not a qualified individual with a disability.

Further, Barrow does not establish the second prong – he does not allege that he was excluded from a service or program at Marcy due to his alleged exhibitionism or any of his diagnosed conditions. Carrasquillo v. City of New York, 324 F.Supp.2d 428, 443 (S.D.N.Y. 2003). As noted, Barrow states that he was not denied access to programming and medical trips because of lewd conduct, but because he refused to leave his cell while wearing the jumpsuit. Second Amend. Compl. ¶ 39.[12] Barrow's choice not to participate in the programming and services made available to him cannot now be transformed into unlawful acts by defendants serving as a basis for liability.

Accordingly, defendants' motion to dismiss on these grounds should be granted.

_____

[12] Even assuming Barrow alleged sufficient facts to state a claim under the ADA or RA, the individual defendants cannot be held liable for a violation of the ADA or RA. See Lee v. City of Syracuse, 603 F.Supp. 2d 417, 448 (N.D.N.Y. 2009).

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

1. **RECOMMENDED**, that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No 67) be **GRANTED** as to plaintiff's:

   a. First Amendment claims;

   b. Eighth Amendment claim insofar as it alleged inadequate prison conditions;

   c. Eighth Amendment claim insofar as it alleged inadequate treatment and deliberate indifference to plaintiff's exhibitionism and foot condition;

   d. Fourteenth Amendment claims;

   e. ADA claim;

   f. RA claim; and

   g. 11th Amendment claim;

2. Further **RECOMMENDED** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No. 7) be **DENIED** as to plaintiff's:

   a. Eighth Amendment deliberate indifference claim, regarding the condition of depression;

3. Further **RECOMMENDED**, that Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt. No. 67) be dismissed as no arguments were made in support of this motion.

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed

with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**SO ORDERED.**

Dated: September 25, 2014
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge